```
 1                 UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA


 3

 4    HON. ANDREW J. WISTRICH, U.S. MAGISTRATE JUDGE PRESIDING

 5

 6  UMG RECORDINGS, INC.,      )
    ET AL.,                    )
 7                             )
                   PLAINTIFFS,)
 8                             )
             VS.               )CASE NO.:  CV 07-06835 AHM(AJWX)
 9                             )
    DIVX, INC.                 )
10                             )    (10:21 A.M.)
                   DEFENDANT. )
11                             )
    _____)
12

13

14           DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

15                  LOS ANGELES, CALIFORNIA

16                   SEPTEMBER 11, 2009

17

18

19  COURT DEPUTY:               YSELA BENAVIDES

20  TRANSCRIBED BY:             HUNTINGTON COURT REPORTERS
                                & TRANSCRIPTION INC.
21                              1450 W. COLORADO BOULEVARD
                                SUITE 100
22                              PASADENA, CALIFORNIA 91105
                                (626) 792-7250
23

24

25  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
    TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.          1
```

```
 1  APPEARANCES:

 2

 3  ON BEHALF OF THE PLAINTIFF UMG RECORDINGS, INC.:

 4

 5                          ARNOLD & PORTER
                            BY:   SEAN O. MORRIS
 6                          ATTORNEY AT LAW
                            777 SOUTH FIGUEROA STREET
 7                          44TH FLOOR
                            LOS ANGELES, CA  90017
 8                          (213) 243-4000

 9

10  ON BEHALF OF THE DEFENDANTS DIVX, INC., ET AL:

11

12                          WILSON, SONSINI, GOODRICH & ROSATI
                            BY:   DAVID H. KRAMER
13                          650 PAGE MILL ROAD
                            PALO ALTO, CA  94304-1050
14                          (650) 493-9300

15

16

17

18

19

20

21

22

23

24

25
                                                          2
```

```
 1        LOS ANGELES, CALIFORNIA, FRIDAY, SEPTEMBER 11, 2009

 2

 3                          -OOO-

 4

 5        THE CLERK:  CV 07-06835 AHM(AJWX).  UMG RECORDINGS

 6   INCORPORATED ET ALL VERSUS DIVX INCORPORATED.

 7        COUNSEL?

 8        MR. MORRIS:  GOOD MORNING, YOUR HONOR, SEAN MORRIS

 9   FROM ARNOLD AND PORTER ON BEHALF OF PLAINTIFFS.

10        MR. KRAMER:  GOOD MORNING, YOUR HONOR.  DAVE

11   KRAMER FROM WILSON, SONSINI FOR DIVX.

12        THE COURT:  GOOD MORNING.

13        MR. KRAMER:  GOOD MORNING.

14        THE COURT:  OKAY.  LET ME TELL YOU WHAT I'M

15   INCLINED TO DO ON THESE MOTIONS.  FIRST OF ALL, DIVX'S

16   MOTION FOR PROTECTIVE ORDER REGARDING THE HELL DEPOSITION,

17   I'M INCLINED TO DENY IT.

18        WE ARE AT A LATE STAGE OF THE CASE, NOT AN EARLY

19   STAGE.  THERE DOES SEEM TO HAVE BEEN SOME DIRECT INVOLVEMENT

20   OF MR. HELL IN RELEVANT EVENTS, SO I DON'T SEE THIS AS THE

21   CLASSIC KIND OF ABUSIVE APEX DEPOSITION THAT'S TAKEN EARLY

22   IN THE CASE, WHEN THE CEO HAS ABSOLUTELY NOTHING TO DO WITH

23   ANY ISSUE IN THE CASE DIRECTLY.  AND SO I'M INCLINED TO DENY

24   THAT.

25        WANT TO ADDRESS IT?
```

3

```
1           MR. KRAMER:  CERTAINLY, YOUR HONOR, I WOULD.

2    THANK YOU.  I GUESS I WOULD START BY DISAGREEING WITH YOUR

3    HONOR'S SUGGESTION THAT THERE SEEMS TO BE PROOF IN THIS

4    RECORD THAT MR. HELL HAD ANY DIRECT INVOLVEMENT IN THE

5    OPERATION OF THE STAGE6 SERVICE.  IN FACT, THE TESTIMONY IS

6    TO THE CONTRARY.  I THINK THERE IS NOTHING TO SUGGEST SUCH

7    INVOLVEMENT.  THE FACT THAT --

8           THE COURT:  DIDN'T HE HAVE INVOLVEMENT IN MERGER

9    DISCUSSIONS, OR SPIN-OFF DISCUSSIONS, OR ANALYSIS OF WHETHER

10   IT SHOULD BE SPUN OFF THAT, YOU KNOW, SUGGESTS HE HAS SOME

11   KNOWLEDGE, UNDERSTANDING HOW THIS WORKS?

12          MR. KRAMER:  -- WELL, CERTAINLY, YOUR HONOR.  BUT

13   UNDER THE APEX DEPOSITION STANDARD -- LET ME ADDRESS THAT.

14   I DON'T BELIEVE HE WAS PRINCIPALLY RESPONSIBLE FOR

15   DISCUSSIONS AROUND THE SPIN-OFF.  BUT THE WAY THAT THE --

16   POTENTIAL SPIN-OFF -- SPIN-OFF WHICH NEVER WAS CONSUMMATED.

17          BUT THE WAY THAT THE APEX DEPOSITION DOCTRINE IS

18   SUPPOSED TO WORK IS THAT THE PARTIES SEEKING TO DEPOSE THE

19   SENIOR-MOST EXECUTIVE OF ITS ADVERSARY WALKS IN AND SAYS,

20   THIS IS THE GUY I NEED TO TESTIFY ON THIS SUBJECT.  THIS GUY

21   HAS UNIQUE OR SUPERIOR KNOWLEDGE ON THIS SUBJECT.  IF UMG

22   WERE TRULY INTERESTED IN THE SUBSTANCE OF THE SPIN-OFF, OR

23   THE UNCONSUMMATED SPIN-OFF, IT WOULD HAVE SENT IN

24   INTERROGATORIES ABOUT THE SUBJECT.  IT WOULD HAVE LISTED

25   THAT TOPIC AMONG THE LAUNDRY LIST OF TOPICS IT ASKED FOR A
```

4

1   CORPORATE DESIGNEE ON.  DIVX PUT UP A CORPORATE DESIGNEE TO

2   TESTIFY ON 25 TOPICS, AND THAT WITNESS WAS ABLE TO ANSWER

3   QUESTIONS ABOUT THIS UNCONSUMMATED SPIN-OFF EXPLAINING WHY

4   IT DIDN'T HAPPEN.

5           I WILL TELL YOU THAT, IT SEEMS TO ME, THERE'S NO

6   TESTIMONY THAT MR. HELL COULD GIVE ABOUT THIS SPIN-OFF OR,

7   AGAIN, PROPOSED SPIN-OFF, THAT WOULD BEAR ON UMG'S PRIMA

8   FASCIA CASE OF COPYRIGHT INFRINGEMENT OR ON DIVX'S DEFENSES

9   TO IT.

10          BUT, AGAIN, THAT'S NOT THE SHOWING THAT UMG HAS TO

11  MAKE.  THEY HAVE TO SHOW -- NOT THAT MR. HELL MIGHT BE ABLE

12  TO SAY SOMETHING OF RELEVANCE, BUT THAT THE TESTIMONY THAT

13  THEY EXPECT TO GET FROM MR. HELL, THEY COULDN'T GET ANYWHERE

14  ELSE.  SO THEY DIDN'T SERVE INTERROGATORIES.  THEY HAVEN'T

15  EVEN ASKED US, WHO SHOULD I TALK TO ABOUT THIS SPIN-OFF

16  QUESTION?  WHO'S THE RIGHT WITNESS?  GIVE ME A COUPLE OF

17  HOURS WITH THAT PERSON."

18          THEY'RE GOING AFTER THE CEO, AND THAT SUGGESTS, TO

19  US, GIVEN HIS LACK OF DIRECT INVOLVEMENT IN THE EVENTS IN

20  ISSUE HERE, THAT THIS IS MORE ABOUT BURDEN DISRUPTION, AND

21  FRANKLY A HAIL MARY AT THE CLOSE OF DISCOVERY, THAN IT IS

22  ABOUT SEEKING LEGITIMATE INFORMATION GERMANE TO THE CASE.

23          THE COURT:  THEY'RE TRYING TO UNDERSTAND YOUR

24  CLIENT'S BUSINESS, UNDERSTAND THE MARKETPLACE, THE

25  STRATEGIES THAT YOUR CLIENT PURSUED, ISN'T MR. HELL AN

5

1    APPROPRIATE PERSON TO ANSWER THOSE QUESTIONS?

2              MR. KRAMER:  NO, YOUR HONOR.  IN FACT, THAT'S

3    PRECISELY WHAT THE APEX DOCTRINE IS SUPPOSED TO PREVENT.

4    YOU'RE NOT SUPPOSED TO GET THE CEO TO TALK ABOUT THE

5    CLIENT-BUSINESS STRATEGIES.  AND CERTAINLY WHERE THE CEO WAS

6    NOT INVOLVED --

7              THE COURT:  ALL RIGHT.  WHAT IS THE CASE THAT

8    SAYS, UNDER THE APEX DEPOSITION DOCTRINE, YOU'RE NOT ALLOWED

9    TO ASK THE CEO ABOUT BUSINESS STRATEGIES?  IT'S NOT A PROPER

10   BASIS FOR TAKING THE CEO'S DEPOSITION OR, YOU KNOW, ISSUES

11   ABOUT THE INDUSTRY, THE MARKET.

12             MR. KRAMER:  SURE.  THE CASES THAT PROVIDE THAT

13   THE APEX DEPOSITIONS ARE ONLY TO BE TAKEN WHERE THE CEO HAS

14   UNIQUE OR SUPERIOR KNOWLEDGE --

15             THE COURT:  THAT'S NOT MY QUESTION.  WHAT IS THE

16   CASE THAT SAYS THE PURPOSE OF THIS DOCTRINE IS TO PRECLUDE

17   THE KIND OF QUESTIONING THAT I JUST DESCRIBED.  IT'S NOT

18   PROPER TO NOTICE THE CEO'S DEPOSITION, TO ASK HIM ABOUT

19   THOSE OVERALL ISSUES CONCERNING THE INDUSTRY, THE

20   BUSINESS --

21             MR. KRAMER:  WELL, I GUESS I CAN ONLY ANSWER THE

22   QUESTION BY SAYING THOSE CASES, SOLARITY, THE GOOGLE

23   AMERICAN BLIND CASE FROM THE NORTHERN DISTRICT OF

24   CALIFORNIA.  I THINK THE CALIFORNIA COURT OF APPEAL CASE IN

25   LIBERTY MUTUAL IS INSTRUCTED IN THIS REGARD.  IT'S BECAUSE

6

1   THE DOCTRINE REQUIRES UNIQUE OR SUPERIOR KNOWLEDGE THAT

2   THOSE KINDS OF QUESTIONS ARE IMPROPER AT A CEO'S DEPOSITION

3   UNLESS THE CEO IS THE ONLY PERSON WHO CAN TESTIFY ABOUT THE

4   COMPANY'S STRATEGIES, OR CAN TESTIFY ABOUT THE INDUSTRY

5   WHICH IS CERTAINLY NOT THE CASE HERE, AND UMG HAS MADE NO

6   SUCH SHOWING.  THOSE CASES PROVIDE THAT THE CEO IS NOT TO BE

7   DEPOSED ON THOSE SUBJECTS.

8           WE DID PUT UP A WITNESS.  A CORPORATE DESIGNEE WHO

9   PREPARED FOR A WEEK, WHO TALKED TO A DOZEN PEOPLE WHO LOOKED

10  AT SCORES OF DOCUMENTS, TO TESTIFY IN THIS CASE, AND HE WAS

11  DEPOSED FOR TWO DAYS.  THEY'VE GOTTEN THAT INFORMATION.

12          I DON'T THINK, FRANKLY, THAT THE INDUSTRY, OR THE

13  STRATEGIES OF DIVX'S MAIN BUSINESS, ARE RELEVANT HERE.  AND

14  GIVEN THAT MR. HELL HAD NO DIRECT INVOLVEMENT IN THE

15  OPERATION OF STAGE6, WHICH IS, AT BEST, A SIDELINE TO DIVX'S

16  MAIN BUSINESS, I DON'T BELIEVE THAT HE'S THE RIGHT PERSON TO

17  BE TESTIFYING ON THESE SUBJECTS.

18          THE COURT:  ALL RIGHT.  LET ME HEAR HOW THEY

19  RESPOND.

20          MR. MORRIS:  THANK YOU, YOUR HONOR.  FIRST OF ALL,

21  I AGREE WITH YOUR INITIAL STATEMENTS THAT THERE IS A --

22  DEFINITELY IN THE RECORD AND WHAT WE'VE SHOWN -- THAT

23  MR. HELL HAS HAD DIRECT INVOLVEMENT IN SOME OF THE ISSUES

24  THAT ARE KEY TO THIS CASE.  AND LET ME BACK UP THOUGH.

25  THERE'S REALLY TWO ASPECTS OF THIS.  THERE IS THE PROCEDURAL

                                                          7

1    AND THE SUBSTANTIVE.

2           PROCEDURALLY, THERE WAS SOME SUGGESTION THAT THIS

3    IS JUST DONE TO TRY TO HARASS DIVX OR HARASS MR. HELL.  BUT,

4    OF COURSE, WHAT WE'VE SHOWN, THROUGH THE RECORD, IS THAT,

5    FIRST OF ALL, WE ASKED FOR MR. HELL'S DEPOSITION RIGHT ABOUT

6    THE SAME TIME THAT THEY WERE ASKING FOR ALL OF OUR

7    DEPOSITIONS, SO IT WASN'T LATE IN THE PROCESS AT LEAST

8    PARTICULARLY GIVEN WHAT --

9           THE COURT:  I'M NOT REALLY INTERESTED IN THE ISSUE

10   OF YOUR MOTIVE SO MUCH AS I'M INTERESTED IN WHAT THE

11   INFORMATION IS THAT YOU THINK HE HAS THAT YOU CAN'T SENSIBLY

12   GET ELSEWHERE.

13          MR. MORRIS:  SURE.  LET ME GO TO THE SUBSTANCE

14   THEN, YOUR HONOR.  WHAT THE DOCUMENTS SHOW, AND WHAT THE

15   TESTIMONY THAT WE HAVE BEEN ABLE TO GET THUS FAR SHOW, IS

16   THAT MR. HELL, WHEN HE TOOK OVER FROM MR. GREENHALL AS CEO

17   IN 2007, WAS DIRECTLY INVOLVED IN ASPECTS REGARDING STAGE6

18   INCLUDING IMPORTANT ADVERTISING DEALS, HOW THEY FIT, HOW

19   THOSE ADVERTISING DEALS FIT WITH STAGE6 AND INTO THE LARGER

20   DIVX BUSINESS STRUCTURE.  AND THEN WHEN THE SPIN-OFF WAS

21   CONTEMPLATED, HOW THAT WAS GOING TO AFFECT DIVX'S

22   BUSINESS -- THE REST OF DIVX'S BUSINESS, WHICH THEY'VE

23   DESCRIBED AS THEIR MAIN BUSINESS BEING THE COMPRESSION

24   SOFTWARE.  AND THEN WHEN THE FINAL DECISION WAS MADE TO SHUT

25   DOWN, ALSO HOW THAT WAS GOING TO AFFECT THE BUSINESS, HOW

8

1   EVERYTHING FIT TOGETHER, HOW STAGE6 PLAYED WITHIN THE DIVX

2   STRUCTURE.

3            AND THEN IT'S DEFINITELY RELEVANT, IT'S NOT JUST A

4   SIDE ISSUE IN THIS CASE, BECAUSE ISSUES RELATED PARTICULARLY

5   WITH RESPECT TO THE DMCA, THE DEFENSE THAT THEY HAVE RAISED

6   AND THAT THERE'S CURRENT SUMMARY (INAUDIBLE) PENDING

7   ABOUT -- RAISE ISSUES REGARDING THIS BUSINESS IN WHICH THERE

8   ARE INFRINGEMENTS THAT ARE UPLOADED ONTO A SYSTEM THAT DIVX

9   IS RUNNING.

10            THE QUESTION IS, HOW DOES THAT BUSINESS FIT INTO

11   WHAT DIVX IS DOING.  BECAUSE IF IT'S MORE THAN JUST

12   PROVIDING ACCESS AND PROVIDING A PLACE FOR INDIVIDUALS TO

13   UPLOAD MATERIALS AND TO SHARE THEM, IF DIVX IS PART OF THAT

14   BUSINESS, IF DIVX IS BENEFITING FINANCIALLY AND IS FITTING

15   INTO THEIR BUSINESS OF BEING ABLE TO SPREAD THEIR SOFTWARE,

16   WHICH IS THEIR MAIN BUSINESS, THOSE ARE ALL VERY RELEVANT

17   TOPICS.

18            THOSE ARE ISSUES THAT HAVE BEEN LISTED IN, FOR

19   EXAMPLE, THEIR STATEMENT OF UNDISPUTED FACTS, ONE OF THEIR

20   STATEMENTS OF UNDISPUTED FACTS IN THE MOTIONS FOR SUMMARY

21   JUDGMENT IS THAT THE DIVX STAGE6 SITE WAS SHUT DOWN, THEY

22   SAY, PRIMARILY BECAUSE IT WASN'T MAKING ANY MONEY.  BUT THE

23   ISSUES OF SHUTTING DOWN STAGE6, IF IT -- ALSO HOW IT FIT

24   INTO AND HOW IT WAS DEVIATING, IF AT ALL, FROM THEIR MAIN

25   BUSINESS, IS DIRECTLY RELEVANT TO THE ISSUES OF THE DMCA

9

1    DEFENSE.  AND SO --

2              THE COURT:  WHAT DO YOU MEAN IT WAS DEVIATING FROM

3    THEIR MAIN BUSINESS?

4              MR. MORRIS:  WELL, THAT WAS PROBABLY A POOR CHOICE

5    OF WORDS.  HOW IT WAS FITTING INTO THEIR MAIN BUSINESS.

6    MEANING THAT STAGE6 WAS A PLAT -- ONE OF THE ISSUES WITH

7    STAGE6 IS THAT IT WAS A PLATFORM TO BE ABLE TO SPREAD THE

8    DIVX SOFTWARE, AND SPREAD THE DIVX BRAND, AND SPREAD THE

9    DIVX NAME.  AND THAT WAS ONE OF THEIR -- ONE OF THE GOALS OF

10   STAGE6.  AND THAT IS DIRECTLY RELEVANT TO ISSUES

11   PARTICULARLY WITH RESPECT TO DMCA AND THE CASE IN GENERAL.

12   SO DECISIONS THEN ABOUT WHY --

13             THE COURT:  HOW IS THAT RELEVANT TO THE DMCA?

14             MR. MORRIS:  IT'S RELEVANT BECAUSE ONE OF THE

15   ISSUES IN THE DMCA IS WHY -- IS FOR THE (INAUDIBLE) ISSUE,

16   IF THERE'S A SERVICE PROVIDER THAT'S PROVIDING AN

17   OPPORTUNITY FOR INDIVIDUALS TO UPLOAD MATERIAL.

18             IF THE INFRINGEMENT RELATES TO THAT ASPECT, OR IF

19   IT RELATES TO MORE THAN JUST THE UPLOADING BUT, IN FACT, THE

20   ENTITY THAT IS PROVIDING THE OPPORTUNITY TO DO THAT, IS IT

21   BENEFITING FINANCIALLY, AND IS IT BENEFITING THROUGH -- WHAT

22   THEIR GENERAL BUSINESS MODEL, THAT IS DEFINITELY RELEVANT

23   BECAUSE THEN THEY FALL OUTSIDE OF THE DMCA.  IT'S MORE THAN

24   JUST BY -- THE INFRINGEMENT IS MORE THAN JUST BY REASON OF

25   THE PROVIDING ACCESS TO MATERIAL UPLOADED BY A USER.

                                                          10

```
 1          SO THESE ARE ALL -- THESE ARE KEY ISSUES, YOUR
 2   HONOR, THAT MR. HELL, WHEN HE TOOK OVER FOR MR. GREENHALL,
 3   AS CEO, WAS DIRECTLY INVOLVED IN AS, ARE DOCUMENTS THAT WE
 4   HAVE BEEN ABLE TO SHOW, REFLECT.
 5          I MEAN, HE WAS -- MR. GREENHALL WAS DIRECTLY AND
 6   VERY INVOLVED IN THE ISSUES AND THEN MR. HELL TOOK OVER FOR
 7   HIM.  HE WAS INVOLVED IN, YOU KNOW, VERY IMPORTANT,
 8   APPARENTLY, ADVERTISING DEALS THAT -- ADVERTISING DEALS THAT
 9   ENCOMPASS BOTH DIVX, DIVX'S OTHER BUSINESS, AND STAGE6.  AND
10   THEN THE DECISIONS TO -- HOW THAT WAS GOING TO AFFECT THE
11   BUSINESS, HOW AND WHY THE SHUTDOWN WAS GOING TO IMPACT
12   (INAUDIBLE) BUSINESS AS WELL, WAS SOMETHING THAT MR. HELL
13   WAS THE KEY PERSON INVOLVED.
14          AS THE TESTIMONY -- YOU KNOW, IN THE 30(B)(6)
15   WITNESS HAD ONLY LIMITED KNOWLEDGE ON THOSE SUBJECTS BECAUSE
16   HE WASN'T DIRECTLY INVOLVED.  I MEAN, AND HE WAS -- HE WAS
17   THE COUNSEL, ACTUALLY, THAT WAS PUT UP FOR THESE TOPICS?
18          THE COURT:  SO WHAT?  HE SAID HE DIDN'T KNOW THE
19   ANSWER?
20          MR. MORRIS:  HE ONLY REMEMBERS VERY FEW
21   CONVERSATIONS WITH MR. HELL EVEN THOUGH THE DOCUMENTS
22   REFLECT THAT MR. HELL WAS DIRECTLY INVOLVED IN THE DECISION
23   TO SHUT DOWN THE SITE.  SO THIS IS A SITUATION WHERE, YOU
24   KNOW, THE 30(B)(6) WITNESS, I THINK, WAS NOT FULLY PREPARED
25   ON THESE TOPICS.  CERTAINLY DOESN'T OBVIATE THE NEED TO TAKE
```
                                                      11

1   THE DEPOSITION OF SOMEBODY --

2              THE COURT:  NOW, WHAT DO YOU MEAN WASN'T FULLY

3   PREPARED?  DID YOU ASK HIM A QUESTION AND HE SAID, "I DON'T

4   KNOW"?

5              MR. MORRIS:  WELL, FOR EXAMPLE, IN OUR MOTION, WE

6   GIVE EXAMPLES WHERE HE DOESN'T RECALL -- THERE ARE CITATIONS

7   TO SEE THE RECORD WHERE HE DOESN'T RECALL ANY CONVERSATIONS

8   WITH MR. HELL WHEN HE WAS TRANSITIONED IN THE ROLE OF CEO

9   AND DOESN'T KNOW THE EXTENT TO WHICH HE WAS WORKING WITH

10  MR. GREENHALL, IN THAT TRANSITION, AND QUESTIONS ABOUT

11  WHETHER OR NOT, AND WHY HE WAS MAKING THE DECISION TO SHUT

12  DOWN STAGE6.  SO I THINK ALL OF THIS IS --

13             THE COURT:  HE DOESN'T KNOW WHY MR. HELL WAS

14  MAKING THAT DECISION?

15             MR. MORRIS:  HE DIDN'T HAVE DIRECT KNOWLEDGE OF

16  ALL OF THE REASONS THAT MR. HELL WAS -- HELP MAKE --

17             THE COURT:  DID YOU ASK HIM WHAT WAS THE REASONS

18  WERE?

19             MR. MORRIS:  HE -- THE REASONS THAT HE GAVE WERE

20  LIMITED, OR THEN THAT HE SAID HE WASN'T PREPARED TO

21  TESTIFIED ABOUT EITHER BECAUSE IT'S PRIVILEGE OR BECAUSE HE

22  DIDN'T KNOW.  I MEAN, THAT'S ALL THAT'S REFLECTED IN THE

23  RECORD.

24             SO, I MEAN, IN SHORT, I MEAN, WHAT, YOU'RE HONOR,

25  HAD SUGGESTED IN THE BEGINNING, WE HAVE DEMONSTRATED THAT

                                                        12

1   THERE IS A DIRECT -- MR. HELL HAS DIRECT KNOWLEDGE.  THIS IS

2   NOT ONE OF THESE SITUATIONS, AS YOUR HONOR MENTIONED, THAT

3   WE'RE JUST OUTRIGHT, OFF THE BAT, TRYING TO TAKE HIS

4   DEPOSITION TO HARASS.  THERE'S THE RECORD THAT REFLECTS THAT

5   HE HAS KNOWLEDGE AND DIRECT INFORMATION THAT IS RELEVANT TO

6   THE ISSUES THAT ARE IN THIS CASE.

7          THE COURT:  ALL RIGHT.  LET ME JUST ASK YOU ONE

8   MORE QUESTION AND THAT IS, HOW LONG DO YOU THINK THIS

9   DEPOSITION WOULD TAKE?

10          MR. MORRIS:  I'M NOT SURE, YOUR HONOR.  I MEAN, I

11   THINK THE DEPOSITIONS IN THIS CASE HAVE -- FOR EXAMPLE, THE

12   DEPOSITION OF THE 30(B)(6) WITNESS, SCHEDULED FOR TWO DAYS,

13   DIDN'T TAKE THE FULL TWO DAYS, BECAUSE WE WEREN'T THERE TO

14   TRY AND HARASS THAT WITNESS.  WE WERE THERE TO GET THE

15   INFORMATION.  YOU KNOW, I WOULDN'T WANT TO PRECLUDE

16   OURSELVES --

17          THE COURT:  I'M JUST WONDERING, COULD WE -- COULD

18   WE -- IF THIS GOES FORWARD, COULD WE LIMIT IT TO HALF A DAY?

19          MR. MORRIS:  I WOULD CERTAINLY TAKE A HALF A DAY

20   OVER NO DAY, YOUR HONOR.  I WOULDN'T WANT TO LIMIT

21   OURSELVES, BUT I UNDERSTAND IF THAT'S WHAT THE COURT WOULD

22   BE INCLINED TO DO, THAT WE WOULD BE ABLE TO -- YOU KNOW, WE

23   WOULD CERTAINLY LIVE WITH THAT.

24          MR. KRAMER:  YOUR HONOR, MAY I BE HEARD BRIEFLY?

25          THE COURT:  YES.

                                                          13

1          MR. KRAMER:  THE REASON THAT THE WITNESS WASN'T

2    ABLE TO TESTIFY ABOUT CONVERSATIONS WITH MR. HELL IS BECAUSE

3    MR. HELL DIDN'T HAVE ANY CONVERSATIONS WITH THE PERSON

4    RESPONSIBLE FOR THE OPERATIONS OF THE SERVICE WHO IS

5    MR. MILLSTEEN (SIC).  THAT'S THE CORPORATE DESIGNEE.  HE

6    DIDN'T SPEAK WITH MR. HELL BECAUSE MR. HELL WASN'T INVOLVED

7    IN THE OPERATION OF THE SERVICE.

8          WITH RESPECT TO THE DECISION TO SHUT DOWN THE

9    SERVICE, THAT DECISION WASN'T MADE BY MR. HELL.  IT WAS MADE

10   BY OTHER PEOPLE.  IT WAS SIMPLY BLESSED BY MR. HELL AND THE

11   BOARD OF DIRECTORS, THE KIND OF THING THAT A CEO WOULD

12   TYPICALLY GET INVOLVED IN, AND --

13          THE COURT:  HOW MUCH OF DIVX'S BUSINESS WAS

14   STAGE6?

15          MR. KRAMER:  IN TERMS OF REVENUE, YOUR HONOR, AN

16   INFINITESIMALLY SMALL PERCENTAGE THAT THE SERVICE LOST

17   TEN -- $14 MILLION, I BELIEVE, IN ITS VERY BRIEF TENURE.  IT

18   WAS VERY VERY SMALL.  A SIDELINE AT BEST.  I WOULD SAY LESS

19   THAN 1 PERCENT OF THE REVENUE OF THE BUSINESS.  THE -- THE

20   WITNESS AT THE CORPORATE -- AT THE CORPORATE DEPOSITION,

21   TESTIFIED ABOUT THE REASONS FOR THE SHUTDOWN.  HE EXPLAINED

22   WHY THE SERVICE WAS SHUT DOWN.  THE FACT THAT HE COULDN'T

23   TESTIFY AS TO PRIVILEGED INFORMATION DOESN'T CHANGE THE

24   ANALYSIS.  MR. HELL COULDN'T TESTIFY TO THAT EITHER.

25   ASSUMING HE EVEN KNEW.  THIS WITNESS KNEW THE REASONS, AND

                                                      14

1    HE GAVE THE REASONS AS TO WHY THE SERVICE WAS SHUT DOWN.

2    ALTHOUGH, FRANKLY, WE DON'T THINK THE SHUTDOWN OF THE

3    SERVICE BEARS ON THE QUESTION OF COPYRIGHT INFRINGEMENT,

4    BECAUSE COPYRIGHT INFRINGEMENT HAD TO DO WITH THE OPERATION,

5    NOT THE SHUTDOWN.

6            ON THE AD DEALS, THE CORPORATE DESIGNEE TESTIFIED

7    FOR WHAT MUST HAVE BEEN 50 PAGES ABOUT ALL THINGS

8    ADVERTISING RELATING TO STAGE6.  HOW IT WORKED, WHAT THE ADS

9    WERE.  WE PUT THIS IN OUR SUPPLEMENTAL BRIEF IN THE

10   SUPPLEMENTAL DECLARATION OF NATALIE MORGAN.  HOW IT WORKED,

11   HOW THE ADS WERE SELECTED, WHO THE DEALS WERE WITH.

12           THE ONLY QUESTION THAT UMG POINTED TO THAT THE

13   WITNESS WASN'T ABLE TO ANSWER WAS, "WHAT ARE THE TERMS OF

14   THE SPECIFIC DEAL WITH THIS SPECIFIC COMPANY?"  THEY HAVE

15   THE DOCUMENTS IN WHICH THOSE TERMS ARE CONTAINED.  IT WASN'T

16   A MEMORY TEST, OR SHOULDN'T BE.  AND THE CEO OF THE COMPANY

17   DOESN'T NEED TO BE CALLED TO TESTIFY TO EXPLAIN THOSE TERMS

18   PARTICULARLY SINCE HE WASN'T INVOLVED IN NEGOTIATING AD

19   DEALS.  AD DEALS FOR STAGE6.

20           THE DEAL THAT UMG POINTS TO IS NOT AN ADVERTISING

21   DEAL AT ALL.  IT IS, IN FACT, A SOFTWARE DISTRIBUTION DEAL.

22   A VERY DIFFERENT BEAST.  I THINK IT IS GROSSLY UNFAIR TO

23   SUGGEST THAT THIS 30(B)(6) WITNESS WAS AT ALL UNPREPARED TO

24   TESTIFY --

25           THE COURT:  YEAH, I DON'T REALLY SEE THAT BASED ON
                                                        15

```
 1   THE RECORD BEFORE ME, SO YOU DON'T NEED TO ARGUE THAT

 2   FURTHER.

 3            MR. KRAMER:  VERY WELL THEN, YOUR HONOR.  I THINK

 4   THAT IF THE COURT IS INCLINED TO ALLOW ANY TESTIMONY OF

 5   MR. HELL AT ALL, IT SHOULD BE CONFINED TO SPECIFIC TOPICS.

 6   IT SHOULD BE NARROWED TO A SPECIFIC AMOUNT OF TIME.

 7            FRANKLY, I WOULD PREFER THAT THE PARTIES TALK

 8   ABOUT THE SUBJECT ON WHICH THEY WISH TO DEPOSE MR. HELL SO

 9   THAT WE CAN IDENTIFY A PERSON WHO MIGHT ACTUALLY KNOW

10   SOMETHING ABOUT THAT SUBJECT RATHER THAN DRAGGING THE CEO

11   INTO AN BE NECESSARY DEPOSITION.

12            THE COURT:  OKAY.  LET'S TALK ABOUT THE OTHER

13   MOTION.  THIS HAS TO DO WITH KENSLER'S DOCUMENTS.  I'D LIKE

14   TO HEAR FROM BOTH OF YOU ABOUT THE RELEVANCE OF KENSLER AND

15   DOCUMENTS -- HIS DOCUMENTS AND WHETHER THERE REALLY IS A

16   REALISTIC CHANCE THAT SOMETHING IMPORTANT WOULD BE FOUND IN

17   THOSE DOCUMENTS THAT HASN'T ALREADY BEEN PRODUCED.

18            YOU KNOW, I HAVE TO SAY THAT WHEN I RULED ON THE

19   INITIAL MOTION, I FELT THAT THE NEED TO PRODUCE HIS

20   DOCUMENTS REALLY WASN'T COMPELLING, BUT I THOUGHT IT WAS

21   BETTER TO ERROR ON THE SIDE OF -- OF HAVING THEM PRODUCED.

22   NOW THAT I KNOW THAT THAT WOULD ENTAIL QUITE A LARGE BURDEN,

23   IT LOOKS SOMEWHAT DIFFERENT TO ME, SO --

24            MR. KRAMER:  CERTAINLY, YOUR HONOR.  I BELIEVE

25   WILL SAY THIS.  MR. KENSLER WAS DIRECTLY INVOLVED IN WHAT
```

                                                              16

1    UMG CALLS ITS ANTI-PIRACY GROUP.  HE WAS INVOLVED IN

2    REVIEWING THE STAGE6 SERVICE FOR UMG, IDENTIFYING WORKS ON

3    THAT SERVICE THAT UMG EITHER WANTED TO LEAVE THERE OR WANTED

4    TO TAKE DOWN.  DOCUMENTS THAT SHOW THAT MR. KENSLER CAME

5    ACROSS WORKS ON THE UMG SER -- ON THE STAGE6 SERVICE, AND

6    CHOSE TO LEAVE THEM THERE, WOULD BE HIGHLY PROBATIVE ON THE

7    QUESTIONS OF ACQUIESCENCE, WAIVER, IMPLIED LICENSE.

8            THEY WOULD ALSO BE HIGHLY RELEVANT ON THE

9    QUESTIONS OF RED-FLAG KNOWLEDGE, THE ISSUE THAT IS CENTRAL

10   THE DMCA ANALYSIS.  BECAUSE IF MR. KENSLER, ARMED WITH ALL

11   OF THE KNOWLEDGE THAT UMG HAS ABOUT WHAT WORKS IT OWNS, AND

12   WHAT WORKS IT IS AUTHORIZED, AND WHAT WORKS IT HAS PUT OUT

13   INTO THE WORLD, CANNOT IDENTIFY WORKS THAT UMG BELIEVES ARE

14   UNAUTHORIZED ON THE STAGE6 SERVICE.

15           IT STANDS TO REASON THAT DIVX COULD NOT POSSIBLY

16   RECOGNIZE THOSE WORKS AS ALLEGEDLY UNAUTHORIZED.  SO WE

17   BELIEVE THAT MR. KENSLER HAS A CONSIDERABLE AMOUNT OF

18   INFORMATION THAT BEARS ON THIS CASE AND THAT WOULD BE

19   IMPORTANT FOR US IN THE EVENT THAT WE GO TO TRIAL ON THESE

20   QUESTIONS.

21           AS TO THE BURDEN OF COLLECTING THESE DOCUMENTS, I

22   AM REMINDED -- I THINK WE'VE ADDRESSED IT IN OUR PAPERS, BUT

23   I AM REMINDED OF THE STORY OF THE KID WHO KILLS HIS PARENTS

24   AND ASKS FOR MERCY BECAUSE HE'S NOW AN ORPHAN.  UMG IS IN

25   THIS SITUATION BECAUSE OF ITS OWN CONDUCT.  UMG --

                                                        17

```
 1              THE COURT:   SIR, YOUR ARGUMENT THAT AFTER THE
 2    CASE WAS FILED THEY DOWNGRADED THE ACCESSIBILITY.
 3              MR. KRAMER:   THEY HAD THESE DOCUMENTS.   THEY WERE
 4    OBLIGATED TO PRESERVE THESE DOCUMENTS.   HE HAD THE DOCUMENTS
 5    ON AN ACTIVE LAPTOP, HE HAD DOCUMENTS ON THEIR ACTIVE E-MAIL
 6    SERVERS.   AND THEN AFTER THAT, WHEN HE LEFT THE COMPANY,
 7    THEY CHOSE TO MAKE THESE DOCUMENTS INACCESSIBLE.   THEY
 8    DELETED THOSE DOCUMENTS.   EITHER THAT'S FOLIATION OR THEY
 9    NEED TO GO OUT AND TO GET THE DOCUMENTS THAT THEY SHOULD
10    HAVE BEEN PRESERVING ACTIVELY FROM WHEREVER THEY MIGHT
11    RESIDE.   HAVE I ANSWERED YOUR HONOR'S QUESTION?
12              THE COURT:   YES.
13              MR. KRAMER:   OKAY.
14              MR. MORRIS:   I CAN ADDRESS THIS BRIEFLY, YOUR
15    HONOR.   AS THE DOCUMENTS THAT WE HAVE PRODUCED, AND THE
16    TESTIMONY THAT IS OUT THERE ABOUT MR. KENSLER REFLECTS,
17    MR. KENSLER WAS NOT SOMEBODY WHO WAS MAKING DECISIONS ON
18    THESE ISSUES.   WHAT HE WAS DOING, HE WAS WORKING AS PART OF
19    A TEAM AND REPORTING TO DAVID BENJAMIN, AND OTHERS, WHOSE
20    DOCUMENTS HAVE BEEN PRODUCED, WHO HAVE BEEN OFFERED FOR
21    DEPOSITION, WHOSE DEPOSITIONS HAVE BEEN TAKEN IN OTHER CASES
22    AND ARE GOING TO BE USED IN THIS CASE.
23              THE -- WHAT MR. KENSLER WAS DOING, AS THE
24    DOCUMENTS REFLECT, IS THAT HE WAS LOOKING -- THE EXTENT HE
25    WAS INVOLVED IN THIS CASE AT ALL, HE APPARENTLY LOOKED AT
```
                                                              18

1    THE STAGE6 SITE, FOUND SOME VIDEOS AND FORWARDED THEM ALONG.

2    NOW, THE -- WHAT FORWARDED THEM ALONG TO MR. BENJAMIN, AND

3    OTHERS ON HIS TEAM WHO THEN RECEIVED THIS INFORMATION, WERE

4    SUBJECT TO DEPOSITION, THEIR DOCUMENTS AND THEIR MATERIALS

5    WERE SEARCHED AND PRODUCED.  MR --

6            THE COURT:  LET ME JUST BE SURE I UNDERSTAND THE

7    STRUCTURE.  MR. BENJAMIN WAS IN CHARGE OF THIS?

8            MR. MORRIS:  YES, THAT'S MY UNDERSTANDING.  YEAH.

9            THE COURT:  AND THEN MR. KENSLER WAS REPORTING TO

10   HIM?

11           MR. MORRIS:  YES.  FOR EXAMPLE, THERE'S A

12   DOCUMENT, IN EXHIBIT 17 -- I'M SORRY, EXHIBIT 7 --

13   REFLECTING THAT STRUCTURE.

14           THE COURT:  ALL RIGHT.  AND THERE WERE OTHER

15   PEOPLE ALSO LOOKING AT THE STAGE6 WEBSITE WHO WERE ALSO

16   REPORTING TO MR. BENJAMIN?

17           MR. MORRIS:  THEY WERE WORKING WITH THE UMG -- IN

18   THE UMG PIRACY DIVISION IN NEW YORK.

19           THE COURT:  DID THEY LOOK AT THE STAGE6 WEBSITE?

20           MR. MORRIS:  THE INFORMATION WAS FORWARDED ON TO

21   THEM.  I'M NOT SURE IF THEY THEN WENT -- THIS WAS AFTER THE

22   CASE HAD ALREADY BEEN FILED ANYWAY, YOUR HONOR, SO THIS WAS

23   NOT -- THIS WAS -- THEY COME ACROSS THIS, APPARENTLY EVEN

24   THOUGH THE CASE WAS ALREADY GOING ON AND THE MATERIALS THAT

25   WERE -- HAD BEEN ALREADY PART OF THE COMPLAINT, ET CETERA.

                                                            19

```
1    SO MY UNDERSTANDING IS THAT HE WAS PART OF A TEAM, THE OTHER
2    MEMBERS OF THE TEAM HAVE ALREADY BEEN OFFERED IN SUBJECT FOR
3    DEPOSITION IF DIVX CHOSE TO GO THAT WAY.  THEY HAD BEEN --
4    THEY'VE BEEN DEPOSED IN OTHER CASES THAT THAT DEPOSITION --
5             THE COURT:  WHO WERE THE OTHER MEMBERS OF THE
6    TEAM?
7             MR. MORRIS:  DAVID BENJAMIN IS ONE.
8             THE COURT:  BENJAMIN WAS IN CHARGE OF IT.
9             MR. MORRIS:  THAT'S MY UNDERSTANDING, YES.
10            THE COURT:  ALL RIGHT.  SO WHO WERE THE OTHER
11   PEOPLE ALONG WITH KENSLER?
12            MR. MORRIS:  IF YOU GIVE ME A MOMENT, YOUR HONOR,
13   IT'S PART OF THE DECLARATION HERE.  DAVID BENJAMIN, WENDY
14   NEWSBAUM (PHONETIC), DAVID RING, DAVID WIENBERG AND AMANDA
15   MARKS WERE PEOPLE THAT HE COMMUNICATED ABOUT WITH RESPECT TO
16   WHAT HE HAD APPARENTLY SEEN ON STAGE6.
17            SOME OF THOSE PEOPLE ARE NOT PEOPLE THAT WORK
18   DIRECTLY IN HIS GROUP, BUT THEY ARE -- YOU KNOW, THEY ARE
19   UMG EMPLOYEES THAT WORK ON THE WEST COAST THAT HE WAS
20   PROVIDING INFORMATION TO.  AND EACH OF THOSE PERSONS HAS
21   BEEN -- THERE MATERIALS HAVE BEEN SEARCHED, AND DOCUMENTS
22   PRODUCED.  AND SEVERAL OF THEM HAVE EITHER BEEN DEPOSED, OR
23   OFFERED FOR DEPOSITION, OR PREVIOUS DEPOSITIONS HAVE BEEN
24   PROVIDED TO DIVX AS WELL.
25            THE COURT:  ALL RIGHT.  WHY -- I MEAN, HE WAS
                                                          20
```

1    DOING SOMETHING THAT'S DIRECTLY RELEVANT.  AND, YOU KNOW, I

2    RECOGNIZE THAT SOME OF HIS WORK MIGHT BE REFLECTED IN

3    E-MAILS, OR DOCUMENTS, CONVERSATIONS WITH THESE OTHER

4    PEOPLE.  BUT, YOU KNOW, WHAT ARE THE ODDS THAT ALL OF HIS

5    WORK HAS ALREADY BEEN PRODUCED?

6            MR. MORRIS:  MY UNDERSTANDING IS THAT THERE IS --

7    BASED ON MY UNDERSTANDING -- THERE IS VERY LITTLE CHANCE, IF

8    ANY, THAT ANYTHING THAT HE KNEW HASN'T ALREADY BEEN

9    REFLECTED IN EVERYTHING THAT'S BEEN PRODUCED OR BEEN

10   TESTIFIED TO.  THIS WAS NOT SOMEBODY WHO IS, LIKE I SAID,

11   MAKING ANY SORT OF -- HE WAS ACTING AT THE DIRECTION OF

12   OTHER PEOPLE.  HE WASN'T MAKING ANY DECISIONS ABOUT THINGS.

13   HE WAS FORWARDING ON INFORMATION TO PEOPLE THAT HE WAS

14   WORKING FOR THAT WERE GIVING HIM DIRECTION.  I MEAN, THAT'S

15   THE WAY HE WORKS GENERALLY.  AND, YOU KNOW, HE WAS THERE AT

16   THE COMPANY FOR VERY -- RELATIVELY SHORT PERIOD OF TIME, AND

17   THEN --

18           THE COURT:  WHEN WAS HE AT THE COMPANY?

19           MR. MORRIS:  HE WAS AT THE COMPANY IN 19 -- 2007.

20   AND HIS TERM -- HE'D BEEN THERE FOR, LIKE, A YEAR-AND-A-HALF

21   MAYBE, YOUR HONOR.  I'D WANT TO DOUBLE THAT CHECK THAT TO

22   FIND THE EXACT REFERENCE.  BUT HE HAD BEEN THERE FOR, YOU

23   KNOW, A PARTICULARLY LONG PERIOD OF TIME.  HE'D TAKEN OVER

24   FROM SOMEBODY ELSE WHO HAD BEEN PART OF THE CONTENT GROUP

25   WHO PERFORMED SIMILAR --

                                                          21

```
 1            THE COURT:  AND WHO WAS THAT THAT HE TOOK OVER

 2   FOR?

 3            MR. MORRIS:  THAT PERSON'S NAME ESCAPES ME.  THAT

 4   WAS PART OF A DEPOSITION THAT HAS BEEN -- OF MR. BENJAMIN IN

 5   ONE OF THE OTHER INFRINGEMENT CASES THAT'S BEEN PROVIDED TO

 6   COUNSEL FOR DIVX THAT EXPLAINS THE WHOLE CONTENT PROTECTION

 7   STRUCTURE -- GROUP STRUCTURE.  AND THERE WERE --

 8   MR. BENJAMIN WAS IN CHARGE OF THAT GROUP, AND THERE WERE A

 9   SERIES OF PEOPLE THAT HE HAD WORKING FOR HIM IN THAT --

10            THE COURT:  ALL RIGHT.  WOULD YOU REMIND ME WHAT

11   THE RELEVANT TIME PERIOD ENDS FOR THIS CASE?  I MEAN, THIS

12   SITE WAS ONLY UP FOR A SHORT PERIOD OF TIME AS I RECALL.

13            MR. MORRIS:  RIGHT.  THE SITE WENT LIVE TO THE

14   PUBLIC IN AUGUST 2006, WAS UP FROM 2006 THROUGH 2007, AND

15   THEN TAKEN DOWN IN FEBRUARY OF 2008, I BELIEVE.

16            THE COURT:  ALL RIGHT.

17            MR. MORRIS:  EITHER END OF JANUARY OR FEBRUARY OF

18   2008.

19            THE COURT:  AND WAS MR. KENSLER WORKING FOR THE

20   COMPANY AND ASSIGNED THIS RESPONSIBILITY THROUGHOUT THAT

21   PERIOD?

22            MR. MORRIS:  WELL, HE WAS WITH THE COMPANY IN

23   2007.  I WOULDN'T NECESSARILY DESCRIBE IT AS BEING ASSIGNED

24   THIS RESPONSIBILITY.

25            THE COURT:  DO WE KNOW WHEN HE WAS WORKING ON
                                                            22
```

1    THIS?

2          MR. MORRIS:  I'M NOT SURE WHAT, YOUR HONOR, MEANS

3    BY WORKING ON THIS.  HE --

4          THE COURT:  REVIEWING THE STAGE6 WEBSITE FOR

5    POTENTIALLY INFRINGING MATERIAL.

6          MR. MORRIS:  SEE, AND THIS IS WHAT I'M SAYING,

7    YOUR HONOR.  I DON'T THINK THAT MR. KENSLER WAS REVIEWING --

8    THERE WAS A SPECIFIC ASSIGNMENT FOR AN ONGOING PROJECT IN

9    REVIEWING THE STAGE6 WEBSITE.  HE FOUND SOME STUFF ON STAGE6

10   AND FORWARDED IT ALONG, MY UNDERSTANDING, TO MR. BENJAMIN.

11   BUT THIS WAS AFTER THE CASE HAD ALREADY BEEN BROUGHT.  SO IT

12   WAS ONE OF THESE THINGS WHERE I DON'T THINK THERE WAS A --

13   IT WASN'T LIKE THERE WAS A COORDINATION OF WHAT WAS GOING ON

14   WITH RESPECT TO THE LITIGATION AND WHAT HE WAS DOING AS PART

15   OF THE CONTENT WHERE HE -- AGAIN, THIS IS MY

16   UNDERSTANDING --

17         THE COURT:  WELL, I GUESS IT WAS HIS

18   RESPONSIBILITY, IN PART, TO LOOK FOR INFRINGING MATERIAL ON

19   THE WEBSITE?

20         MR. MORRIS:  WELL, I THINK WHAT HAD HAPPENED TOO

21   WAS THE -- AND, AGAIN, I'M PIECING THIS TOGETHER FROM --

22   FROM OTHER SOURCES OF INFORMATION, THAT THE RIAA, WHICH, IN

23   GENERAL, GOES OUT AND LOOKS FOR INFRINGEMENTS, HE HAD

24   CONNECTION -- HE HAD CONTACTS WITH THE RIAA THAT SOMETIMES

25   DOES WORK FOR UMG.  AND THAT AS PART OF THAT, HE HAD SEEN

                                                          23

```
 1   THE STAGE6 WEBSITE, EVEN THOUGH THIS CASE HAD ALREADY BEEN

 2   GOING ON, AND THAT THERE HAD BEEN DOCUMENTS PRODUCED AND

 3   REVIEWS OF THE STAGE6 WEBSITE THAT MR. KENSLER WASN'T

 4   INVOLVED IN AT ALL FROM MY UNDERSTANDING.  THIS WAS

 5   SOMETHING THAT CAME UP BECAUSE OF WHAT HIS ROLE WAS WITH

 6   RESPECT TO THE CONTENT POLICY THAT WAS A MINOR THING THAT HE

 7   FOUND, FOREGONE INFORMATION, WENT TO MR. BENJAMIN.  THAT'S

 8   MY UNDERSTANDING OF HOW THINGS WORKED WITH RESPECT TO THIS.

 9   THAT'S WHY I DON'T THINK --

10            THE COURT:  YOU KNOW HE LOOKED AT THE SITE --

11            MR. MORRIS:  YES.

12            THE COURT:  -- THAT'S AN ISSUE IN THIS CASE.  AND

13   HE FOUND SOME MATERIAL HE THOUGHT WAS INFRINGENT.

14            MR. MORRIS:  AND HE FORWARDED THAT ALONG.

15            THE COURT:  AND WE DON'T KNOW, YOU KNOW, HOW MUCH

16   HE REVIEWED THE SITE OR OVER WHAT PERIOD OF TIME.

17            MR. MORRIS:  MY UNDERSTANDING IS THAT IT WAS

18   NOT -- THAT HE WASN'T REVIEWING THE SITE OVER VERY MUCH AT

19   ALL, AND THAT IT WASN'T --

20            THE COURT:  HOW DO WE KNOW THIS?  THIS IS WHAT --

21   WHY IT WOULD BE NICE TO SEE THESE DOCUMENTS.  I MEAN, MAYBE

22   HIS INVOLVEMENT WAS TRANSITORY AND SLIGHT, OR --

23            MR. MORRIS:  THIS IS WHAT I'M SAYING, YOUR HONOR.

24   WHAT I DO KNOW IS HIS ROLE WAS THAT HE REPORTED THINGS,

25   WHATEVER HE WAS DOING, TO MR. BENJAMIN.  AND MR. BENJAMIN'S
```

24

1    INFORMATION HAS BEEN COLLECTED AND PRODUCED.  AND THAT

2    INCLUDES WHAT MR. KENSLER DID WITH RESPECT TO THE SITE.  AND

3    THAT IS REFLECTED IN THE DOCUMENTS THAT ARE PART OF THE

4    RECORD NOT VERY MUCH AT ALL, AND IT WASN'T CONNECTED TO THIS

5    PARTICULAR LITIGATION.

6          THE COURT:  HOW DO WE KNOW THAT HE REPORTED

7    EVERYTHING HE DID TO MR. BENJAMIN?

8          MR. MORRIS:  WELL, I BELIEVE THAT THE -- MY

9    UNDERSTANDING IS THAT THAT'S THE WAY IT WORKED, AND

10   MR. BENJAMIN HAS TESTIFIED, IN CONNECTION WITH THE OTHER

11   CASE, HOW THAT CONTENT PROTECTION GROUP WORKED.

12         I THINK WHAT -- THIS REALLY IS, YOUR HONOR, A

13   SITUATION WHERE THERE ARE MATERIALS THAT CAME UP WITH

14   RESPECT TO MR. KENSLER BECAUSE, YOU KNOW, THE MATERIALS THAT

15   HE WORKS ON GETS FORWARDED TO MR. BENJAMIN.  MR. BENJAMIN'S

16   FILES WERE SEARCHED, AND SEARCHED THOROUGHLY, AND ANYTHING

17   THAT HAD ANYTHING TO DO WITH STAGE6 WERE PRODUCED AND TURNED

18   OVER.

19         I THINK THAT THE BURDEN HERE OF GOING THROUGH TO

20   FIND SOMETHING THAT, FRANKLY, IS NOT GOING TO BE THERE IS MY

21   HONEST BEST GUESS, THAT THERE'S NOT GOING TO BE,

22   SUBSTANTIALLY, ANYTHING ELSE, IF ANYTHING AT ALL, THAT

23   WOULDN'T -- THAT WOULD BEAR ON THIS CASE PARTICULARLY AT

24   THIS STAGE, YOUR HONOR, WHERE THIS IS NOT -- THERE HAVE

25   ALREADY BEEN A VERY LARGE NUMBER OF UMG EMPLOYEES, INCLUDING

                                                        25

1   THE PEOPLE THAT HE REPORTED TO, THAT HAVE HAD THEIR FILES

2   SEARCHED AND TURNED OVER.

3            THE COURT:  HAVE YOU MADE HIM AVAILABLE FOR

4   DEPOSITION?

5            MR. MORRIS:  WELL, MR. KENSLER IS NOT PART OF

6   THE -- NOT IN THE COUNTRY ANYMORE IS MY UNDERSTANDING, AND

7   ISN'T REPRESENTED BY UMG SO.

8            THE COURT:  HAVE YOU -- I DON'T KNOW.  DO YOU WANT

9   TO TAKE HIS DEPOSITION, MR. KRAMER?

10           MR. KRAMER:  WE WOULD VERY MUCH LIKE TO, YOUR

11  HONOR, BUT WE'RE NOT ABLE TO BECAUSE HE'S IN ISRAEL.  AND

12  WE'RE HAPPY TO CLOSE THE DISCOVERY.  WE WERE RELYING ON

13  THESE DOCUMENTS AND THE COURT'S ORDER THAT THEY'D BEEN

14  PRODUCED AS PROXY FOR TAKING THE DEPOSITION.

15           THE COURT:  LET ME JUST ASK ONE FURTHER QUESTION

16  THEN.  SUPPOSE THEY WERE TO PRODUCE HIM FOR DEPOSITION.

17  WOULD THAT OBVIATE THE NEED FOR THE DOCUMENTS?

18           MR. KRAMER:  I THINK, YOUR HONOR, IT WOULD HELP,

19  BUT IT WOULD NOT OBVIATE THE NEED FOR THE DOCUMENTS.

20  BECAUSE, AS YOUR HONOR KNOWS, TAKING A DEPOSITION ON AN

21  EMPTY RECORD IS MORE DIFFICULT.  I'D CERTAINLY LIKE TO SEE

22  WHAT THIS GENTLEMAN HAS.  IT'S REALLY WHAT HE DIDN'T PASS ON

23  THAT IS OF MOST INTEREST TO ME THAN WHAT HE DID PASS ON.

24           I WILL SAY THAT THE RECORD THAT WE'VE PUT IN

25  REFLECTS THAT HE WAS SENDING MONTHLY REPORTS OF THINGS HE

26

```
 1    FOUND TO OTHERS.  THIS IS NOT INTERMITTENT, SPORADIC
 2    ACTIVITIES.  THIS IS A REGULAR JOB RESPONSIBILITY THIS GUY
 3    TO REVIEW THE SERVICE AND COME UP WITH WHATEVER HE COULD
 4    FIND.  I'D LIKE TO KNOW WHAT HE -- WHAT HE SAW AND CHOSE NOT
 5    TO FOCUS ON.  AND THAT'S GOING TO BE IN HIS DOCUMENTS AND
 6    LIKELY NOT IN ANYONE ELSE'S.
 7           MR. MORRIS:  COUPLE OF THINGS, YOUR HONOR.  FIRST
 8    OF ALL, I'M NOT SURE THAT WE WOULD BE ABLE -- IF THE
 9    QUESTION IS PRODUCING FOR DEPOSITION, I'M NOT SURE WE HAVE
10    THE POWER TO MAKE HIM AVAILABLE FOR A DEPOSITION.  JUST WANT
11    TO NOTE THAT.
12           THE SECOND IS THAT THE IDEA THAT THE -- THAT THEY
13    FELT THE NEED -- THAT THE DOCUMENTS THAT THEY SHOW -- THAT
14    THEY'VE BEEN ABLE TO FIND -- REFLECT SOME GREATER NEED OF
15    THEM TO FIND OUT AND FIGURE OUT WHAT MR. KENSLER WAS DOING
16    AND WHAT HIS DOCUMENTS MAY SHOW.  IT'S JUST NOT THERE.  I
17    MEAN, I THINK THIS IS REALLY A SITUATION WHERE THEY'RE
18    TRYING TO MAKE A MOUNTAIN OUT OF A -- NOT EVEN A MOLE HILL
19    ON THIS WHERE THERE HAS BEEN EXTENSIVE DISCOVERY ABOUT ALL
20    OF THIS TYPE OF ACTIVITY.  AND THAT THE -- MR. KENSLER WAS
21    WORKING AND REPORTING DIRECTLY TO MR. BENJAMIN.
22    MR. BENJAMIN RECEIVED THOSE DOCUMENTS.  THEY DIDN'T EVEN
23    DEPOSE MR. BENJAMIN IN THIS CASE.  INSTEAD CHOOSING TO
24    RELY --
25           THE COURT:  DID MR. BENJAMIN LOOK AT THE STAGE6
```

27

```
 1    SITE HIMSELF?
 2              MR. MORRIS:  HE WAS GETTING THE REPORTS FROM
 3    MR. KENSLER AND --
 4              THE COURT:  DID HE LOOK AT THE STAGE6 SITE
 5    HIMSELF?
 6              MR. MORRIS:  I'M NOT SURE WHAT HE DID --
 7              THE COURT:  MR. KENSLER WAS LOOKING AT IT.
 8              MR. MORRIS:  BUT THE DOCUMENTS WERE GOING TO
 9    MR. BENJAMIN, AND HE WAS REPORTING TO MR. BENJAMIN.  NOW,
10    YOU KNOW, IF THIS WAS REALLY AN IMPORTANT ISSUE FOR THEM,
11    THEY WOULD HAVE AT LEAST TRIED FIGURE OUT WHAT MR. BENJAMIN
12    KNEW ABOUT, SPECIFICALLY, STAGE6, BUT INSTEAD CHOSE SIMPLY
13    TO RELY ON THE TESTIMONY FOR MR. BENJAMIN IN PRIOR CASES.
14    SO, YOU KNOW, PARTICULARLY GIVEN THE BURDEN THAT WE'RE
15    TALKING ABOUT HERE -- AND THIS HAS BEEN A CONSIST THEME IN
16    OTHER RESPECTS.  FOR EXAMPLE, WHEN WE MOVED FOR MR. HI'S
17    DOCUMENTATION, THERE WAS AMPLE EVIDENCE THAT MR. HI WAS A
18    PERSON WHO WAS DIRECTLY INVOLVED IN THE ISSUES OF HOW THE
19    STAGE6 SITE WORKED AND THE WAY IN WHICH THE PROTOCOLS WERE
20    GOING TO BE SET UP FOR THAT.  BUT ONCE IT BECAME CLEAR THAT
21    HIS FILES WERE ON BACKUP TAPE, WELL, THAT ENDED THE ISSUE.
22    YOU KNOW, THE BURDEN, AT THAT POINT, WAS --
23              THE COURT:  WELL, I MEAN, THE BURDEN IS A CONCERN,
24    BUT LET ME JUST ASK YOU THIS, MR. KRAMER.  WHAT IS IT THAT
25    YOU WOULD HOPE TO LEARN FROM THESE DOCUMENTS THAT WOULD
```

28

```
 1  ACTUALLY BE USEFUL TO YOU?

 2          MR. KRAMER:  YOUR HONOR, WHAT THESE DOCUMENTS ARE

 3  GOING TO SHOW IS THAT THIS GUY WAS SPENDING HIS TIME

 4  REVIEWING THE STAGE6 SERVICE, WAS FINDING ONLY A HANDFUL OF

 5  ALLEGED INFRINGEMENTS ON THE SERVICE, AND WAS NOT VIEWING A

 6  SITE THAT UMG HAS CHARACTERIZED AS A MASS INFRINGEMENT SITE,

 7  AS AN INFRINGEMENT ENGINE.  THAT IF THERE WERE UNAUTHORIZED

 8  VIDEOS ON THE SERVICE CONTAINING UNAUTHORIZED COPIES OF UMG

 9  CONTENT, THEY WERE FEW AND FAR BETWEEN.

10          THE COURT:  ALL RIGHT.

11          MR. KRAMER:  THEY WILL ALSO SHOW, BY THE WAY, THAT

12  UMG HAD THE ABILITY TO GIVE NOTICES TO DIVX OF ALLEGED

13  INFRINGEMENTS ON THIS SERVICE.  BUT THAT NOTICES OF ALLEGED

14  INFRINGEMENTS THAT MR. KENSLER IDENTIFIED, BUT THAT UMG,

15  CHOSE INSTEAD, TO SIT ON ITS HANDS AND DO NOTHING SO THAT IT

16  COULD BUILD A CASE LIKE THE ONE THAT WE SEE HERE RATHER THAN

17  FOLLOWING THE PROCEDURES OF THE DMCA, SENDING NOTICE AS THE

18  DMCA REQUIRES, AND GETTING THE CONTENT REMOVED FROM THE

19  SERVICE IF IT WAS SUPPOSEDLY CAUSING HARM.  THAT'S WHAT WE

20  THINK MR. KENSLER'S DOCUMENTS ARE GOING TO SHOW.

21          MR. MORRIS:  ONE FINAL POINT ON THAT, YOUR HONOR.

22  WHILE I DISAGREE WITH THAT'S WHAT THE IMPORT OF THESE

23  DOCUMENTS ARE, ALL OF WHAT MR. KRAMER JUST DESCRIBED IS WHAT

24  IS IN THE DOCUMENTS THAT THEY ALREADY HAVE.  I MEAN, HE'S

25  MAKING THAT ARGUMENT BASED ON THE DOCUMENTS THAT HAVE
```

                                                    29

```
1    ALREADY BEEN PRODUCED BECAUSE THEY WERE FORWARDED BY

2    MR. KENSLER TO MR. BENJAMIN AND OTHERS.  SO THESE ARE

3    DOCUMENTS -- IF THE ISSUE THAT THEY WERE GOING TO TRY AND

4    BUILD IS THAT THIS WAS A SITE THAT WAS BEING REVIEWED BY UMG

5    AND THAT THEY WERE EITHER FORWARDING MATERIAL ONTO THE RIAA

6    OR IDENTIFYING STUFF AND CHOOSING NOT TO DO ANYTHING WITH

7    IT, THAT MATERIAL WAS ALREADY THERE AND AVAILABLE TO THEM.

8             THE COURT:  WELL, I MEAN, YOU'RE ASSUMING THAT HIS

9    REPORTS COMPLETELY DOCUMENTED HIS ACTIVITY.

10            MR. MORRIS:  WHAT I'M --

11            THE COURT:  AND YOU'RE SAYING THAT THAT WAS THE

12   PRACTICE THERE.

13            MR. MORRIS:  WHAT I'M SAYING IS THAT THE ARGUMENT

14   THAT MR. KRAMER JUST MADE ABOUT WHY THEY NEED THE DOCUMENTS

15   IS ALREADY REFLECTED IN THE DOCUMENTS.  I DON'T HAVE TO

16   AGREE WITH THAT ARGUMENT, BUT THAT'S -- THERE'S NO NEED FOR

17   ANYTHING FURTHER, BECAUSE HE'S BUILDING THAT ARGUMENT BASED

18   ON WHAT'S ALREADY BEEN PRODUCED.

19            THE COURT:  SO I GUESS YOU WOULD STIPULATE THAT

20   MR. KENSLER NEVER FOUND ANYTHING INFRINGING OTHER THAN

21   WHAT'S IN HIS REPORTS?

22            MR. MORRIS:  I'D HAVE TO THINK ABOUT THAT.  BUT, I

23   MEAN -- WHAT IS IN HIS REPORTS IS WHAT HE FOUND AND

24   FORWARDED ON, CERTAINLY.

25            THE COURT:  OKAY.  ALL RIGHT.  I'M GOING TO THINK
                                                            30
```

```
 1   ABOUT THAT A LITTLE BIT FURTHER.  I HAVE SOME OTHER MATTERS

 2   TO HEAR.  ON THE HELL DEPOSITION, I'M INCLINED TO ALLOW IT

 3   TO GO FORWARD, TO LIMIT IT TO HALF A DAY.  I ALSO THINK THAT

 4   MR. KRAMER'S SUGGESTION WAS A GOOD ONE, THAT IT WOULD BE

 5   SENSIBLE TO SEE IF WE CAN LIMIT THE SUBJECTS OF THE

 6   DEPOSITION SO THAT THE CEO DOESN'T HAVE TO SPEND A LOT OF

 7   TIME PREPARING TO HANDLE WHATEVER MIGHT BE THROWN AT HIM

 8   FROM LEFT FIELD.  WE CAN FOCUS ON WHY HIS TESTIMONY IS

 9   REALLY NEEDED.  SO WHAT I'M GOING TO SUGGEST IS THAT YOU

10   TAKE HALF AN HOUR, SEE IF YOU CAN REACH AN AGREEMENT ABOUT

11   THAT.  IF NOT, YOU CAN EACH MAKE A PROPOSAL TO ME.  IN THE

12   MEANTIME, I'LL HEAR THESE OTHER MATTERS.

13          MR. MORRIS:  THANK YOU, YOUR HONOR.  WE CAN DO

14   THAT NOW AND COME BACK TO YOU?

15          THE COURT:  YEAH, COME BACK IN A HALF AN HOUR OR

16   SO.

17          (CONCLUSION OF RECORDED MATERIAL.)

18

19

20

21

22

23

24

25
                                                          31
```

1                    TRANSCRIPTIONIST CERTIFICATE

2

3            I, JANE BARNETT, C.S.R. #11790, DO HEREBY CERTIFY:

4            THAT THE FOREGOING AUDIOTAPED PROCEEDING WAS

5    RECEIVED AND TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION

6    AND SUPERVISION;

7            AND I HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT

8    IS A FULL, TRUE AND CORRECT TRANSCRIPT OF THE AUDIOTAPED

9    RECORDING GIVEN TO ME.

10           I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

11   NOR RELATED TO ANY PARTY TO SAID ACTION, NOR ANYWISE

12   INTERESTED IN THE OUTCOME THEREOF.

13           IN WITNESS THEREOF, I HAVE HEREUNTO SUBSCRIBED MY

14   NAME THIS 8TH DAY OF OCTOBER, 2009.

15

16

17                  __JANE BARNETT, C.S.R. #11790__

18                       TRANSCRIPTIONIST

19

20

21

22

23

24

25
                                                              32